**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 16-CR-0065** |
| **JOSE GONZALEZ-VALENCIA,**<br>  **also known as**<br>  **"Jafett Arias-Becerra," "Chepa,"**<br>  **"Camaron," and "Santy,"** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its undersigned counsel, respectfully submits this sentencing memorandum for the above-captioned matter. On December 1, 2022, Defendant Jose Gonzalez-Valencia, also known as "Jafett Arias-Becerra," "Chepa," "Camaron," and "Santy" ("Defendant") pled guilty ██████████████████████ to one count of conspiracy to distribute cocaine for unlawful importation into the United States. On September 16, 2024, Defendant ████████████████████████████████████████████████████ ██████████ For the reasons set forth herein, the Government requests that this Court sentence Defendant to 360 months of imprisonment, five years of supervised release, and a mandatory $100 special assessment. The Government's recommended 360-month sentence falls below the U.S. Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range as calculated by the parties and the Probation Office due to the Brazilian extradition requirement.[2] █████████████████████

---

██████████████████████████████████████████

[2] The Brazilian extradition treaty requires that the Government not seek a sentence greater than 360 months of incarceration—which is not binding on this Court, as stated in the Plea Agreement. Dkt. No. 134, at 3 (providing that "the Court has the authority to impose" a sentence "up to the statutory maximum authorized by law," and that "any recommendation that the Government makes to the Court as to sentencing, whether pursuant to this Plea Agreement or otherwise, is not binding on the Court").

████████████████████████████ Defendant is subject to the ten-year statutory mandatory minimum sentence.

## I.  **INTRODUCTION**

For over a decade, Defendant and his younger brothers Abigael and Gerardo Gonzalez-Valencia led an armed, violent, and prolific drug trafficking cartel in Mexico called "Los Cuinis"—which they created in the early 2000s.[3] While a formidable menace in its own right, Los Cuinis also financed and supported the creation of another brutal Mexico-based cartel called the *Cártel de Jalisco Nueva Generación* ("CJNG"). Since CJNG's inception, Los Cuinis brothers worked closely with the CJNG leader, Nemesio Oseguera Cervantes, also known as "El Mencho" ("Mencho"), who is Defendant's brother-in-law. Together, Los Cuinis and the CJNG are responsible for importing staggering quantities of cocaine, methamphetamine, and fentanyl into the United States, among other illicit substances, and for extreme violence, murders, torture, corruption, and devastation in furtherance of their criminal empires.

During his joint leadership of Los Cuinis, Defendant directed and coordinated the transportation of multi-tonnage quantities of cocaine from Colombia to Mexico, through Central America, using air, land, sea, and under-the-sea methods. He personally invested in multi-tonnage quantities of cocaine, harvesting his ill-gotten money from the devastation of countless others. He directed the murder of a person he perceived as a rival, who allegedly stole a 1,000-kilogram cocaine shipment from Los Cuinis. He also supplied rifles and ammunition to the CJNG—knowing the violent nature of the CJNG.

---

[3] Gerardo Gonzalez-Valencia, the co-defendant in this case, was sentenced by this Court to life imprisonment on July 21, 2023. Judgment and Statement of Reasons, *United States v. Gerardo Gonzalez-Valencia*, No. 16-cr-65 (D.D.C. July 21, 2023), Dkt. Nos. 184-185.

Meanwhile, Defendant took steps to insulate himself from capture, including by carrying firearms, obtaining fictitious identification documents, and traveling internationally using those fictitious documents. In 2015, Defendant went into hiding in Bolivia—a country that for over two decades since 2001 did not extradite anyone to the United States, despite an existing extradition treaty—and resided there for over two years under a fictitious identity. He was arrested in Brazil in 2017, having traveled there from Bolivia under a fictitious identity for a vacation with friends and family.

The Government's recommended 360-month sentence meets the statutory mandatory minimum and the Brazilian extradition requirement. The Government's recommended 360-month sentence departs significantly from the life Guidelines range due to the location of Defendant's arrest, but it is the highest sentence the Government can request to comply with 18 U.S.C. § 3553, even if it creates disparities with some otherwise similarly situated defendants.

## II.    FACTUAL BACKGROUND

### A.    Offense Conduct

The following facts are drawn from the Joint Statement of Stipulated Facts. Dkt. No. 135 ("SOF").[4]

From at least in or about 2006 to October 26, 2016, in Mexico, the United States, and elsewhere, Defendant knowingly, intentionally, and willfully conspired to distribute at least 450 kilograms of cocaine for unlawful importation into the United States. *Id.* ¶¶ 1, 11-13.

---

[4] Defendant's case was initially filed under case number 1:16-cr-192. In November 2021, Defendant's case was joined with his brother's case, *United States v. Gerardo Gonzalez-Valencia*, 16-cr-65 (D.D.C.), due to their participation in the same underlying conspiracy. *See* Gov't Motion for Joinder of Defs. For Trial, *United States v. Gerardo Gonzalez-Valencia et al.*, No. 16-cr-65, Dkt. No. 72; Min. Entry, Nov. 10, 2021 (Order granting Government's joinder motion). This memorandum references docket numbers in the consolidated case, i.e., 16-cr-65, unless otherwise noted.

During the course and in furtherance of the conspiracy, Defendant was a leader of Los Cuinis, which regularly purchased bulk quantities of cocaine from Colombia, transported the cocaine to Central America and Mexico by aircraft and maritime vessels, and illegally imported the cocaine into the United States and Europe for further distribution. *Id.* ¶ 2. Los Cuinis had more than five participants and its drug trafficking operations were extensive. *Id.* ¶ 4. Since around 2010, Los Cuinis also allied with the CJNG and financed its drug trafficking operations. *Id.* ¶ 3.

As a top leader of Los Cuinis, Defendant was responsible for arranging the transportation of cocaine from Central America into Mexico. *Id.* ¶ 5. He personally invested in multi-hundred- and multi-thousand-kilogram shipments of cocaine supplied from Colombia and destined for the United States for further distribution. *Id.* For instance, in approximately 2007, Defendant and others invested in a shipment of at least 4,000 kilograms of cocaine that Defendant knew would be transported from Colombia to Guatemala using a semi-submersible vessel, and from there to Mexico via go-fast boats for eventual importation into the United States. *Id.* ¶ 6. The U.S. Coast Guard interdicted the semi-submersible carrying the 4,000-kilogram cocaine shipment in the Pacific Ocean on or about August 21, 2007. *Id.* Although the semi-submersible's crew scuttled the vessel, the U.S. Coast Guard recovered approximately 280 kilograms of cocaine—a fraction of the 4,000-kilogram shipment—from the water where the semi-submersible sank. *Id.*

Beyond trafficking drugs, in approximately October 2013, Defendant supplied rifles and ammunition to the CJNG. *Id.* ¶ 10. In approximately 2005 and as part of the charged conspiracy, Defendant also directed violence against an individual who allegedly stole a shipment of approximately 1,000 kilograms of cocaine belonging to Los Cuinis. *Id.* ¶ 8. He also carried a firearm in furtherance of the conspiracy from approximately 2002 to 2004 while attending

meetings in Mexico to arrange the receipt of cocaine shipments. *Id.* ¶ 9. He carried the firearm to protect himself and cocaine shipments. *Id.*

### B.    Procedural History

On October 26, 2016, a federal grand jury returned a one-count Indictment charging Defendant with conspiracy to distribute five kilograms or more of cocaine, knowing and intending that the cocaine would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(B), 963, and 18 U.S.C. § 2. Dkt. No. 1.[5]

On December 27, 2017, Brazilian authorities arrested Defendant pursuant to an arrest warrant issued on a U.S. extradition request in this case. Defendant remained detained in Brazil pending his extradition to the United States on November 10, 2021.

On November 12, 2021, Defendant made an initial appearance in the U.S. District Court for the District of Columbia and was arraigned on the Indictment. On December 1, 2022, Defendant pled guilty to the Indictment, ███████████████████████████ Dkt. Nos. 134-135 (Plea Agreement and Joint Statement of Stipulated Facts); ███████████████████ ███████████████     As the Plea Agreement states, the Government has agreed to not seek a sentence exceeding 360 months due to "conditions of the defendant's extradition." Dkt. No. 134 ("PA"), at 3.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[5] *United States v. Jose Gonzalez-Valencia*, 16-cr-192 (D.D.C.).





III.    **PRESENTENCE INVESTIGATION REPORT**

A.    **Statutory Penalties**

Defendant faces a mandatory minimum sentence of ten years of imprisonment, a maximum sentence of life imprisonment, a fine up to $10,000,000, and a term of supervised release of at least five years. PA ¶ 2. Defendant is ineligible for safety valve relief pursuant to 18 U.S.C. § 3553(f). *Id.* ¶ 3(g).

B.    **Sentencing Guidelines Calculation**

The Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). Although the Guidelines are advisory, not mandatory, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.*; *United States v. Booker*, 543 U.S. 220, 222 (2005) (holding that the Guidelines were not mandatory). The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall*, 552 U.S. at 46.

On February 4, 2025, the Probation Office issued a final Presentence Investigation Report ("PSR"), Dkt. No. 214, and a sentencing recommendation, Dkt. No. 215 in this case. The Probation Office recommends a 360-month sentence, which factors in "a downward variance pursuant to *US v. Smith* . . . to avoid unwarranted sentencing disparities." Dkt. No. 215, at 2. The PSR's Guidelines calculation mirrors the parties' calculation as stated in the Plea Agreement. PSR ¶¶ 5-6, 30-43; PA ¶ 3.

Specifically, based on the drug quantity that Defendant is responsible for—450 kilograms or more of cocaine—and pursuant to U.S.S.G. § 2D1.1(a)(5) and (c)(1), the Probation Office

calculated Defendant's base offense level at 38. PSR ¶ 31. The Probation Office also applied the following sentencing enhancements: a two-level increase for Defendant's possession of a firearm under U.S.S.G. § 2D1.1(b)(1); a two-level increase for use of violence or directing the use of violence under U.S.S.G. § 2D1.1(b)(2); a two-level increase for importing controlled substances using a submersible or semi-submersible vessel under U.S.S.G. § 2D1.1(b)(3)(B); and a four-level increase for being an organizer and leader of the criminal activity at issue under U.S.S.G. § 3B1.1(a). *Id.* ¶¶ 32-34, 36. The PSR also notes that Defendant is ineligible for a zero-point offender reduction pursuant to U.S.S.G. § 4C1.1 because of his use of violence, possession of a firearm, and aggravated role in connection with the offense. *Id.* ¶ 42. For the same reason, Defendant is ineligible for relief under the safety valve provision. *Id.* ¶ 5.

The Probation Office calculated Defendant's criminal history as Category I, which the parties do not dispute. *Id.* ¶¶ 6, 46; PA at 3. Accordingly, based on a total offense level of 43[7] and a Criminal History Category I, Defendant's Guidelines range is life imprisonment. PSR ¶¶ 4, 6, 75; PA at 3. His Guidelines range for any fine is $50,000 to $10,000,000. PSR ¶ 94.

## IV.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

After calculating the applicable Guidelines range, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall*, 552 U.S. at 49-50. In doing so, a district court "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented." *Id.* at 39.

---

[7] The parties and the Probation Office calculated Defendant's adjusted offense level as 45. The PSR notes that Defendant's total offense level is 43 per U.S.S.G. guidance. *See* U.S.S.G. ch. 5, pt. A, cmt. 2 ("An offense level of more than 43 is to be treated as an offense level of 43."); *see also* PSR ¶¶ 6, n.3, 38.

Some of the factors courts must consider pursuant to § 3553(a) include: the nature and circumstances of the offense (§ 3553(a)(1)); the history and characteristics of the defendant (same); the need for the sentence to reflect the seriousness of the offense and promote respect for the law (§ 3553(a)(2)(A)); the need for the sentence to afford adequate deterrence (§ 3553(a)(2)(B)-(C)); and the need to avoid unwarranted sentence disparities among defendants with similar records and conduct (§ 3553(a)(6)). In this case, all § 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    The Nature and Circumstances of the Offense, and the Need for the Sentence to Reflect the Severity of the Offense and Promote Respect for the Law

Defendant's conduct compels a significant sentence. For over a decade, Defendant repeatedly and willfully violated multiple criminal laws across several countries, including Colombia, Guatemala, Mexico, and the United States. He paid, armed, and directed countless others to do the same, to commit crimes with him, for him, for his protection, and for his profit— through all means necessary, even murder.

From at least 2006 to October 2016, as a top leader of Los Cuinis, Defendant kept U.S.-bound cocaine flowing steadily from Colombia to Mexico in multi-tonnage quantities. SOF ¶¶ 2, 4. He personally invested in multi-tonnage quantities of cocaine for greater profit, while using different methods to conceal his criminal activities. *Id.* ¶ 5. For instance, he used semi-submersible vessels to transport drugs he invested in, some of which were scuttled to avoid interdiction—such as a 4,000-kilogram cocaine shipment in approximately 2007. *Id.* ¶ 6. He also used coded language in his drug trafficking communications to avoid detection. *Id.* ¶ 7.

In addition, Defendant took up arms, armed his workers, and armed the CJNG to protect and grow his illicit business and profits. *Id.* ¶¶ 9-10. Beyond arming the CJNG, Los Cuinis also financed CJNG's drug trafficking operations, multiplying Los Cuinis' ruinous effects—which

included murder for the sake of money. *Id.* ¶¶ 3, 8. The murder victim, Antonio Guizar Valencia ("Guizar Valencia"), "was found shot to death on his ranch" on January 22, 2005, and Los Cuinis later demanded "$12 million" from the Guizar Valencia family—during Guizar Valencia's funeral—to resolve the debt for the stolen cocaine. Ex. B at 29:19-30:1 (transcript of co-defendant Gerardo Gonzalez-Valencia's sentencing on July 21, 2023). Defendant, as a Los Cuinis leader, was personally responsible for directing that murder.

Because of the leadership role Defendant jointly held with his brothers, much of the conduct this Court found alarming in Gerardo Gonzalez-Valencia's case is also present in this case. In May 2023, this Court received credible testimony by three cooperating witnesses not only about the Guizar Valencia's murder, but also about Los Cuinis' operations and structure. *See id.* at 14:20-24 (noting the Court "did find each of the witnesses . . . to be credible"). When sentencing Gerardo Gonzalez-Valencia, the Court found the following facts salient, which are equally applicable to Defendant's conduct:

> Regarding the nature of the offense, . . . you engaged in this massive international drug conspiracy, you facilitated the importation of tonnage quantities of cocaine into the United States . . . . you were one of the leaders of Los Cuinis. And that was a conspiracy that had tentacles in the United States. It had tentacles in Europe. It was broad reaching with . . . between 50 and 200 subordinates working for Los Cuinis, helping . . . [with] this narcotics distribution, manufacture, importation, and export business.

*Id.* at 50:4-25. This Court found the underlying conduct "extensive," "long-term," and "among the most serious of drug trafficking offenses," which "led to instability in Mexico, instability along the border of our country," and "significant damage to communities in the United States." *Id.* at 48:7-15, 50:22-25.

Meanwhile, as Defendant pumped cocaine into the United States and victimized countless individuals along the way, he took steps to insulate himself from any ramifications. He used

firearms to protect himself. SOF ¶ 9. He also assumed a fictitious identity and obtained fraudulent identification documents to evade capture as he traveled internationally, including to Brazil—which bestowed on him the additional benefit of capping the maximum sentence the Government can request in this case. PSR ¶ 69; Exs. C and C-1[8] (arrest report and Defendant's statements to Brazilian law enforcement upon his arrest, including that he assumed a fictitious identity and obtained fictitious documents to avoid capture by the Mexican law enforcement).

Moreover, because of his resources and high-ranking position within Los Cuinis and the CJNG, Defendant had the luxury to move to Bolivia to evade capture and extradition for over two years. Ex. C-1 at 7 (noting Defendant's statement that he moved to Bolivia "to hide away from Mexican Justice and because it was a quiet location," with "no contacts in the area prior to his arrival"). Meanwhile, Defendant received financial support from his family back in Guadalajara, Mexico, while also vacationing at least twice in Brazil. *Id.* at 1, 2.

For far too long, the law has been merely an inconvenience for Defendant, a hurdle to overcome through different tactics. Defendant's disregard for the law has imposed enormous costs on the United States, Mexico, and other countries: from drug addiction that poisons nations and devastates families, and trafficking routes that erode national security by allowing the flow of drugs, firearms, bulk cash, and even human beings, to other ancillary crimes and violence associated with drug distribution. Accordingly, only a significant sentence as recommended by the Government can reflect the severity of Defendant's offense and promote respect for the law.

---

[8] Exhibit C was disclosed to Defendant on January 7, 2022, under bates numbers 00055834-00055842. The Government obtained the attached documents through a Mutual Legal Assistance Treaty request from its Brazilian counterpart. Exhibit C-1 is the translated version of Exhibit C.

### B.    The History and Characteristics of Defendant

Defendant's history shows that he was not born into crime, nor was he driven into crime by poverty or lack of opportunities—factors that weigh in favor of the recommended lengthy sentence.



Despite his stable and nurturing upbringing, and the opportunity to sustain a lawful living with his significant $8,000-a-month income over 20 years ago—which was worth at least eleven times more in Mexican pesos at the time[9]—Defendant embraced the life of brutal crime. Defendant had that significant income until 2007, ███████████████████████████████████████

████ *Id.* ¶ 69. Therefore, Defendant not only had a meaningful opportunity to avoid a life of crime because of the significant financial resources already at his disposal, but more importantly, he had a compelling reason to withdraw from the conspiracy before Guizar Valencia's murder in 2005. Had he withdrawn, he would have still had the $8,000 monthly income to live gainfully.

---

[9] Based on the Treasury Department's annual reported exchange rates for Mexican pesos from 2003 to 2005, the Dollar-to-Peso exchange rates averaged over eleven percent. FiscalData, *Treasury Reporting Rates of Exchange*, Treasury Dep't, https://fiscaldata.treasury.gov/datasets/treasury-reporting-rates-exchange/treasury-reporting-rates-of-exchange (last visited February 18, 2025).

And as he has admitted, he was not under duress at any point to continue the conspiracy. SOF ¶ 13. But continue he did, not out of need, but because of pure greed.

As such, only a lengthy sentence as recommended by the Government can address the fundamental root of Defendant's criminal activities.

### C.    The Need for the Sentence to Afford Adequate Deterrence

Deterrence is a major sentencing factor in this case, given Los Cuinis and CJNG's operations, and Defendant's leadership role. Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by a given defendant. 18 U.S.C. § 3553(a)(2)(B)-(C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010) (discussing goals of general and specific deterrence).

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). As stated, Los Cuinis has not only been a prolific and violent cartel in its own right since the early 2000s, but it has also financed and supported the creation and operations of the CJNG since its inception around 2010. Together, Los Cuinis and the CJNG have reinforced each other to run expansive operations, such as running clandestine laboratories and distribution networks with routes into the United States, Europe, and elsewhere, as well as well-armed enforcers and money laundering networks. As a result, the two cartels are among the most prolific drug trafficking organizations the world has ever seen. *See, e.g.*, Ex. D at 6:8-7:6 (transcript of law enforcement testimony during evidentiary hearing for Gerardo Gonzalez-Valencia's case on May 4, 2023, regarding Los Cuinis and CJNG joint operations).

To enforce its agenda and generate profits, Los Cuinis, much like the CJNG, bribes, intimidates, tortures, kidnaps, and kills—mainly through its operatives, whom it needs to recruit and maintain. Since at least mid-2000s, Los Cuinis leaders and operatives have acted with a

profound sense of impunity—as showcased by Los Cuinis' murder of Guizar Valencia and their unapologetic demand for $12 million from Guizar Valencia's family after the murder—which underscores the need for significant deterrence. The recommended sentence can help send another clear and consistent message to all existing and would-be drug traffickers—from the current leadership to lower-level members who by their actions sustain and grow Los Cuinis and the CJNG—that punishment by the U.S. criminal justice system is certain and severe.

### *Specific Deterrence*

As noted, Defendant knowingly and willfully became a violent drug lord despite already earning a sizable monthly income to sustain a lawful living. But beyond that, specific deterrence is particularly important in this case because Defendant founded, led, and organized the underlying conspiracy with his close family members and relations—a conspiracy that has enticed many others into a life of crime since early 2000s. Without sufficient deterrence, Defendant can again tap into his resources and his Los Cuinis familial relationships to organize another cartel or reinvigorate Los Cuinis when released—particularly if the U.S. and Mexican Governments weaken or eradicate the CJNG. Importantly, Los Cuinis still operates, and some of its current leaders remain fugitives. Given that, the familial contact and support that Defendant enjoys, which in the majority of cases is a welcome and important factor to prevent recidivism, can also be an after-release landing base for Defendant to continue a life of crime. *See, e.g.*, PSR ¶ 54 (summarizing facts about Defendant's siblings and family, including Abigael Gonzalez-Valencia, and noting they ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. B at 22:9-22, 29:9-18, 31:7-18 (noting Abigael's role in the underlying conspiracy).

Therefore, the Government believes there is a significant risk of recidivism in this case, which justifies a lengthy sentence. The recommended sentence can be a meaningful step to protect

the public and also impress upon Defendant that the era of impunity is over.

### D.    Unwarranted Sentencing Disparities

Finally, § 3553(a)(6) requires a specific evaluation of similarly situated defendants "to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." When determining whether a sentence creates an unwarranted disparity, courts should consider, *inter alia*, a defendant's criminal history, total offense level, Guidelines range, acceptance of responsibility, the nature and extent of a defendant's participation in the criminal activity, and whether and to what extent cooperation was a factor at sentencing. *See, e.g.*, *United States v. Mejia*, 597 F.3d 1329, 1344 (D.C. Cir. 2010) (concluding that difference in sentences was "entirely explained" and not unwarranted due to differences in conduct). A defendant is only entitled to "a weighing of the section 3553(a) factors that are relevant to [his] case, not to a particular result." *United States v. Carrasco-De-Jesus*, 589 F.3d 22, 29 (1st Cir. 2009).

For over a decade, Defendant was a leader of Los Cuinis and a close ally of the CJNG and its notorious leader, Mencho. PSR ¶¶ 12-13; Ex. D at 6:23-7:3 (noting Defendant's familial relationship with Mencho). Defendant admitted responsibility for "regularly" procuring bulk quantities of cocaine from Colombia and transporting the same to Mexico through aircraft and maritime vessels for eventual importation into the United States. PSR ¶ 12. He also invested in multi-tonnage quantities of cocaine himself, which were also destined for the United States. *Id.* ¶ 14. He carried a firearm to protect cocaine shipments and directed violence against at least one person who was murdered in furtherance of the conspiracy. *Id.* ¶ 17; Ex. B at 29:9-30:1. Defendant supplied rifles and ammunition to the CJNG. PSR ¶ 18. He also took steps to avoid arrest, including assuming a fictitious identity and obtaining fictitious documents to avoid arrest. *Id.* ¶ 69.

The recommended 360-month sentence is the most serious sentence the Government can request while also comporting with the Brazilian extradition requirement. The recommended sentence is slightly lower than the average sentence noted in the PSR for similarly situated defendants, i.e., 376 months of imprisonment. *Id.* ¶ 103 (noting "23 defendants whose primary guideline was § 2D1.1 and Powder Cocaine was the primary drug type"). The Government has identified similar cases as presented below, which suggest the recommended sentence would not lead to unwarranted disparities. In selecting these cases, the Government considered defendants' conduct, Guidelines range, criminal history, extent of cooperation, acceptance of responsibility, and sentence.

### Gerardo Gonzalez-Valencia, 16-CR-65 (D.D.C.)

The co-defendant Gerardo Gonzalez-Valencia ("Gonzalez-Valencia") is likely the best comparator to Defendant's case. Gonzalez-Valencia pled guilty to conspiracy to distribute cocaine for unlawful importation into the United States, in violation of 21 U.S.C. §§ 959, 960(a)(3), 960(b)(1)(B)(ii), and 963, and 18 U.S.C. § 2. For over thirteen years, Gonzalez-Valencia led Los Cuinis with his two brothers, including Defendant, regularly purchased bulk cocaine shipments from Colombia for transportation to Mexico and importation into the United States, and personally invested in multi-tonnage quantities of cocaine destined for the United States. With his brothers, he also financed and supported the CJNG from its inception in 2010 until Gonzalez-Valencia's arrest in 2016.

Gonzalez-Valencia pled guilty without a plea agreement, admitted to a barebones statement of facts, and contested several sentencing factors, including enhancements, which led to a contested sentencing in 2023 that lasted almost three days. After hearing testimony from four Government witnesses, including three cooperating witnesses, this Court calculated Gonzalez-

Valencia's Guidelines range as follows: a base offense level of 38; a four-level leadership role enhancement; a two-level enhancement for possession of a firearm; a two-level enhancement for engaging in acts of violence for the directed murder of Guizar Valencia; another two-level increase for importing cocaine using a semi-submersible vessel; and a three-level reduction for acceptance of responsibility. Ex. B at 31:22-32:12. Following these adjustments, Gonzalez-Valencia's total offense level was 45, which with a Criminal History Category III, led to a Guidelines range of life imprisonment. *Id.* at 32:13-17. This Court sentenced Gonzalez-Valencia to life imprisonment. *Id.* at 61:5-10.

Defendant stipulated to the same enhancements and Guidelines range pursuant to the Plea Agreement. Although Defendant faces a Guidelines range of life imprisonment, several factors support the Government's recommended 360-month sentence, beginning with the fact that Defendant, unlike his brother, stipulated to the enhancements and a more detailed statement of facts, ██████████████████████████████████████████████████████ ████████████ Moreover, in this case, unlike Gonzalez-Valencia's case, the Government agreed to the Brazilian extradition requirement to not seek a sentence greater than 360 months, which is a meaningful consideration justifying the lower recommended sentence. Therefore, the Government's recommended 360-month sentence would not create an unwarranted sentencing disparity as compared to Gonzalez-Valencia.

### Defendant A (D.D.C.)[10]

Defendant A pled guilty to conspiracy to import and distribute cocaine for unlawful importation into the United States, in violation of 21 U.S.C. §§ 952, 959, 960, and 963. For over

---

[10] Due to sealing, references to Defendants A and B have been anonymized. The Government will provide those defendants' names and case numbers to the Court *ex parte* upon request.

ten years, Defendant A coordinated the transportation of multi-tonnage quantities of cocaine from Colombia through Central America to Mexico by aircraft and maritime vessels for a Mexico-based cartel. The cocaine was destined for the United States. Defendant A also possessed a firearm and supervised armed associates in furtherance of the conspiracy. Defendant A admitted that the cartel bribed or attempted to bribe law enforcement to avoid drug shipment interdictions. Defendant A was held responsible for over 50 tons of cocaine.

Defendant A's base offense level was 38. Defendant A received a four-level leadership role enhancement, a two-level enhancement for possession of a firearm, another two-level enhancement for bribing or attempted bribing of law enforcement officers, and a three-level reduction for acceptance of responsibility. Defendant A had no known criminal history. Following these adjustments, Defendant A's total offense level was 43, with a Guidelines range of life imprisonment. Defendant A received a 174-month sentence after receiving substantial assistance credit—due to extensive cooperation and a six-month *Smith* departure. Defendant A's uniquely helpful cooperation included testimony and evidence against some of the highest level and most violent defendants, including the top leader of the Sinaloa Cartel at the time, as well as other operatives and leaders of significant cartels in Guatemala and Honduras. Among other results, the Government also secured indictments against at least twelve high-ranking targets based on information Defendant A provided, in addition to guilty pleas in several cases.

Defendant's Guidelines range, as determined by the parties and the Probation Office, is the same as Defendant A's. Defendant distributed a comparable quantity, if not more, of cocaine over the course of fourteen years as did Defendant A. However, Defendant also directed acts of violence, including murder, which more than justifies the recommended 360-month sentence.

█████████████████████████████████████████████████████████████

████████████████████████████████████ Therefore, the Government's recommended 360-month sentence would not create an unwarranted sentencing disparity as compared to Defendant A—whose sentence would have been at least 360 months without the substantial assistance reduction.

### Defendant B (D.D.C.)

Defendant B pled guilty to a conspiracy to distribute cocaine for importation into the United States, in violation of 21 U.S.C. §§ 959(a), 960, and 963, and 18 U.S.C. § 2. For over a decade, Defendant B was a member of a drug trafficking organization that supplied Mexico-based drug trafficking cartels with cocaine from South America for importation into the United States. Defendant B's drug trafficking organization used aircraft and maritime vessels as cocaine transportation methods. For about the last eight years of the charged conspiracy, Defendant B was a senior leader of the drug trafficking organization. Among other roles, Defendant B arranged the transportation of multi-tonnage quantities of cocaine mainly from Colombia to Mexico, oversaw bribes paid to law enforcement in Guatemala, managed drug proceeds, and engaged in acts of violence, including murder and kidnapping. Defendant B possessed a firearm in furtherance of the conspiracy.

Defendant B's base offense level was 38. Defendant B received a three-level role enhancement, a two-level firearm enhancement, a two-level enhancement for engaging in acts of violence, and a two-level increase for bribing law enforcement officials. Defendant B had no known criminal history. After a three-level reduction for timely acceptance of responsibility, Defendant B's total offense level was 43, with a Guidelines range of life

imprisonment. Defendant B was sentenced to 204 months of imprisonment after receiving credit for substantial assistance.

Defendant and Defendant B have comparable conduct and the same Guidelines range, but Defendant was higher-ranking, as reflected in the stipulated four-level role enhancement, and had an instrumental role in spawning two of the most violent criminal organizations in the world, which drastically increases Defendant's culpability. Moreover, Defendant B earned substantial assistance credit for cooperating against other high-ranking targets, including testifying in a contested evidentiary hearing against a high-level drug trafficker and providing information that led to an indictment against a significant target. Therefore, given ███████████████ Defendant's conduct, the recommended 360-month sentence—which is about 43 percent more than Defendant B's sentence—would not lead to undue discrepancy between the two defendants.

## V.    **CONCLUSION**

For the reasons set forth above, the Government recommends 360 months of imprisonment, five years of supervised release, and a mandatory $100 special assessment.

Respectfully Submitted,

Dated: February 28, 2025

MARLON COBAR, Chief
Narcotic and Dangerous Drugs Section
Criminal Division
U.S. Department of Justice

By:    */s/ Lernik Begian*
Lernik Begian
Douglas Meisel
Trail Attorneys
Narcotic and Dangerous Drugs Section
Criminal Division
U.S. Department of Justice
145 N. Street N.E.

Washington, D.C. 20530
202-514-0917
Lernik.Begian@usdoj.gov
Douglas.Meisel@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the Government's Sentencing Memorandum was served through the ECF filing system to counsel of record for Defendant this 28th day of February 2025.

By:    <u>*/s/ Lernik Begian*</u>
         Lernik Begian
         Trial Attorney
         Criminal Division
         U.S. Department of Justice
         Narcotic and Dangerous Drug Section